UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCAROLA ZUBATOV SCHAFFZIN PLLC, | |
| Plaintiff, | 1:20-cv-07432 (___) |
| -against- | |
| | COMPLAINT |
| 1700 BROADWAY OWNER LLC, | |
| Defendant. | PLAINTIFF DEMANDS TRIAL BY JURY OF CLAIMS THAT MAY BE TRIED TO A JURY |

Plaintiff Scarola Zubatov Schaffzin PLLC ("plaintiff" or "SZS"), for its

Complaint against defendant 1700 Broadway Owner LLC ("defendant" or the "Landlord"),

alleges as follows:

1.     This action relates to a commercial lease between plaintiff and defendant

for space on the 41st Floor of the building owned by defendant located at 1700 Broadway, New

York, New York.   As alleged more fully herein, due to the novel coronavirus pandemic in early

2020 in New York City, legal and practical impediments have arisen to the performance of the

lease by the defendant and to the use of the leased space by plaintiff as contemplated by the

parties at the making of the lease, such that defendant could not provide or permit, and plaintiff

could not receive, the benefits of the lease or the use of the space.   As a consequence, the lease

should be terminated, and plaintiff should be refunded amounts paid since those impediments

arose (amounts paid under protest and paid by plaintiff because of the Landlord's insistence and

assertions that failures to pay would be a default under the lease (with drastic adverse

consequences for plaintiff)), or alternatively, the amount of monthly rent owed should be abated

and/or reduced for the periods the lease and the use of the premises were or will be affected (with

refund of the amounts paid under protest and paid by plaintiff because of the Landlord's

insistence and assertions that failures to pay would be a default under the lease).   Plaintiff seeks

declaratory, monetary and injunctive relief.   As set forth more specifically in the claims herein,

plaintiff seeks relief based upon specific provisions of the parties' lease and also on common law

and statutory doctrines (including frustration of purpose, impossibility, commercial

impracticability, unconscionability as codified in RPL §235-c, illegality and material breach).

Plaintiff also seeks relief substantively and functionally equivalent to a *Yellowstone* injunction,

with the effect that plaintiff need not pay further rent or other charges by the Landlord during the

pendency of this case, without it or any other party being deemed in default under the lease and

without facing lease termination under adverse circumstances and with adverse results, and

without any other direct or indirect adverse action being taken or available to the Landlord

against plaintiff or any other party by reason of or during such injunction relating to the lease in

any way, all so as to preserve the *status quo* pending this case's resolution.

### The Parties

2.      Plaintiff SZS is a limited liability entity law firm located and existing

under the laws of the State of New York, New York.   It has no member that is not a natural

person who resides in and is a citizen of the State of New York.

3.      Defendant Landlord is a Delaware limited liability company with its

principal place of business in Boston, Massachusetts or Dallas, Texas.   Based upon investigation

(including numerous inquiries to defendant's outside counsel to which no substantive reply was

made), defendant's sole member is Rockpoint Group, L.L.C. ("Rockpoint"),[1] that is itself a

---

[1] Rockpoint acquired the building at 1700 Broadway in or around January 2018 from a New York State-based real estate concern known as The Ruben Companies ("Ruben").   References herein to the Landlord at times prior to this acquisition are to the predecessor owner to which defendant is a successor in all relevant respects.

limited liability company or real estate investment trust under §§856 *et seq.* of the Internal

Revenue Code of 1986, and which has no members, directly or indirectly, in the State of New

York, such as to destroy diversity jurisdiction in the Court in this case.   Defendant's principal

place of business is not in New York, where the real property including the space in issue is

located, because it has delegated all of its operation and management of the building to a

surrogate entity, Rockhill Management, L.L.C. ("Rockhill").   By way of example, a recent

request for routine insurance information from all tenants at 1700 Broadway came from

Rockhill, on Rockhill stationery and sent by self-identified Rockhill employees, and requested

that beneficiaries of tenant insurance policies be listed as:

> 1700 Broadway Owner LLC
> Rockhill Management, L.L.C.
> 500 Boylston Street
> 21st Floor
> Boston, MA 02116

After diligent search, plaintiff believes that defendant itself has no website, employees or active

business activity, and serves only as the passive owner of title to the building at 1700 Broadway

and party in name to leases with tenants there, but that all of its affairs are conducted either (i) at

the offices of Rockpoint in Boston (or one of its other locations outside of New York City

(principally, Dallas, Texas), or (ii) through Rockhill as its designee, such that its principal place

of business is at a location in a state other than within the State of New York.

*Jurisdiction and Venue*

4.      This Court has personal jurisdiction over defendant because of its

ownership of the building at 1700 Broadway.

5.      Jurisdiction in this court is proper under the diversity jurisdiction

provisions of 28 U.S.C. §1332(a) because plaintiff is a citizen of the State of New York and

defendant is a citizen of a different state or states, as alleged above, and the amount in controversy in this case exceeds $75,000 exclusive of interest and costs.

6.      Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this case occurred in New York State and in this District, and a substantial part of the property that is the subject of the action is situated in New York State and in this District.

*Statement of Facts Pertinent to More than One Cause of Action*

A.  *The Lease and Its Negotiation, Some of Its Key Terms and Its Performance by Plaintiff*

7.      The parties' lease was entered into as of February 2, 2012 (the "Lease") for a term through August 2022, with plaintiff having additional renewal term rights.   It consists of 129 total pages, including its schedules and exhibits, including 73 single-spaced, dense pages of actual lease terms and provisions.   As alleged more fully below, the Lease was the product of only limited discussions and negotiation, and most provisions, including any at issue in this case, were not the subject of any discussion, much less negotiation at all.

8.      Consistent with the manner in which transactions of this sort are conducted in commercial real estate practice and transactions in New York City with small tenants the approximate size of plaintiff, at a time when plaintiff's previous lease was coming to an end without provision for renewal, and with the need for new space for its business, plaintiff and the Landlord reached agreement on the basic lease price and similar principal deal terms — commonly known as a "handshake" deal.

9.      Thereafter, after reaching an apparently made in good faith, but unenforceable, handshake deal, the Landlord, through its counsel, presented a draft of a lease to plaintiff.

4

10.     The draft lease contained numerous new terms, almost all written in a manner favoring the Landlord, with many critical terms being inconsistent even with those points specifically negotiated in the time leading to the handshake deal.

11.     Those numerous terms adverse to plaintiff's interests had never been discussed and most — with the exception of certain key deal terms previously negotiated (some reflecting a different term from what the draft proposed) — were not addressed at all before the Lease was signed, even though some of those provisions might, in some contingencies, have unreasonably and, in some instances, horrifically onerous, consequences for plaintiff.

12.     Plaintiff faced a scenario typical for the common, similarly situated prospective tenant in New York City commercial leasing scenarios:   (i) limited time was available to reach a signed lease without suffering grave, or at least exceedingly costly, consequences for the prospective tenant of being a holdover tenant if a lease would not be completed swiftly to allow construction work to commence on new space so as to be done and ready for a move before the previous lease's end (in fact, the work in this case was not completed on time, leading to costly holdover penalties for plaintiff with its previous landlord); (ii) innumerable aggressive pro-landlord draft lease terms and inflexible negotiating positions were brought to the Landlord's draft by the Landlord and its counsel, introduced at the figurative last minute (all while the Landlord was feigning ignorance about the practical and time considerations); (iii) new draft terms included an enormous array of never-previously-discussed provisions that were dense (in some instances, impenetrable), arcane, prolix, manifestly oppressive and unreasonable, and all coming from the stock, boilerplate "starting point" lease that the Landlord's counsel presents to essentially all new tenants in such circumstances, with the consequences that they were incapable of being analyzed, much less discussed or negotiated, in

the time available; (iv) the Landlord and its counsel expressed clearly and directly unwillingness even to discuss many such terms (much less to negotiate changes in such draft terms); and (v) there was a practical need to address the previously negotiated terms not reflected in the draft lease and also the most oppressive other terms that could be identified under the constraints existing in the limited time and limited room for negotiating available (generally, those most likely to relate to a scenario that would likely occur or have an immediate or certain consequence), with the result that many other unconscionable lease terms addressed to more remote contingencies or less pressing, unlikely-to-occur events remained in the Lease, with no recognition or discussion, and with there having been no meaningful opportunity for plaintiff to review or negotiate them, the Lease needing to be signed to secure new space as the clock ran out on the old lease (or after it already had run out in some respects).

13.     That protocol — after reaching a handshake deal, flooding the prospective tenant with an enormous array of unconscionable material that could not and would not be meaningfully negotiated or even discussed or recognized — is a standard operating procedure in commercial leasing of the type at issue here.

14.     That was the protocol by which the Lease involved in this case came to be.

15.     By way of specific examples of terms that were supposed to have been subject to the handshake deal but which ate up the vast amount of the limited time and limited room for negotiation, as with most leases, the handshake deal included substantial guarantee obligations for plaintiff's principals, two individuals (at the time the Lease was made), along with substantial security obligations, all of which had enormous potential consequences for those two individuals and all of which required extensive and line-by-line negotiation as to the late-arriving draft guaranty provisions, the so-called "good guy clause" provisions for guarantors and

the lease security terms, all stated in terms aggressively more favorable to the Landlord, some

purely overreaching, and certainly overreaching as compared with the handshake terms.

16.    The negotiation of those provisions, as drafted and presented, required

discussion and negotiation of new and different risks and alone was both torturous and time-

consuming, without connection to any other point in the Lease.   The amount of time needed to

address those issues alone, given the limited window of time for any negotiation of any other

terms, occupied an enormous component of the available time, leaving no time for negotiation of

every other aspect of the arcane, prolix and draconian lease terms.

17.    By way of a further, and critical, specific example, as the remaining

limited time for reaching a lease agreement ran down (in other words, as plaintiff's then-current

lease was coming to an end and other negotiations for other space had gone cold in favor of

negotiations with defendant (it not being possible (or ethical) to proceed ahead on multiple

tracks)), the draft lease failed to provide for all of the aspects of one expressly negotiated major

deal point to which the parties had agreed when they reached their handshake as to key terms.

Specifically, it was a critical term for plaintiff, and specifically agreed upon in advance orally at

an early discussion stage prior even to the handshake point in time, that plaintiff would have the

right to license the use of individual offices and common facilities (such as use of reception

services, conference rooms, *etc.*) within the leased space to other attorneys and professionals (to

the extent of the space, other than a minimum of 40% of the space plaintiff would use itself).

Plaintiff had engaged in this practice for years in its prior space, and it was central to the

economics of the proposed lease that plaintiff continue to be able to do so for numerous reasons,

including that plaintiff already had such licensees in its then-current space which had committed

to move with plaintiff, such licensing was a part of the development and growth of the firm's

practice and also that, given the size of the firm and the size of the proposed leased space, such licensing arrangements would be necessary to ensure that the cost of the space would be realistic and manageable.

18.     Nonetheless, the initial drafts of the lease agreement failed to implement this critical negotiated term and had numerous ancillary inconsistent and material provisions inserted beyond what had been agreed as a handshake and which needed to be identified and corrected to implement just this one part of the overall deal as it had been negotiated.   Because of the dilemma presented by this issue's treatment, both in itself, as the lease was drafted by the Landlord's counsel, and also as exacerbated by intransigent positions of the Landlord's outside counsel when it was discussed, it was necessary to devote an inordinate amount of the limited time and human bandwidth available for negotiation of any lease points specifically to that one issue that should not have been an issue at all.

19.     Again, this is an example of the Landlord's standard operating procedure — propose an enormous and unmanageable draft lease with limited time for discussion, and fill it with many incorrect and oppressive terms, leaving the result that, as the prospective tenant would find its clock ticking down to zero, many oppressive terms were left undiscovered, undiscussed, unnegotiated and/or untouched.

20.     To be clear, during the discussions leading up to execution of the Lease, there was no discussion, much less any negotiation whatsoever, of any term that might be deemed applicable to any event such as the coronavirus pandemic or other circumstance that might have the effects on permissible uses and performance for the Landlord or effects on plaintiff to receive the use and benefits of the space such as those which have developed since early 2020.

8

21.     During the negotiations leading up to execution of the Lease, there was no discussion or negotiation whatsoever of any government action that might address an event such as the coronavirus pandemic or other circumstance that might have the effects on permissible uses and performance for the Landlord or effects on plaintiff to receive the use and benefits of the space such as those which have developed since early 2020.

22.     The Lease itself does not address any particular event such as the coronavirus pandemic or any particular government action that might address an event such as the coronavirus pandemic or other circumstance that might have the effects on permissible uses and performance for the Landlord or effects on plaintiff to receive the use and benefits of the space such as those which have developed since early 2020.

23.     Plaintiff has paid all of its rent and complied with all of its obligations under the Lease since the inception of the Lease.

24.     Plaintiff had a good working relationship with the ownership team at Ruben after the Lease was executed, and Ruben's people were generally available, even if at times hyper-aggressive in ongoing relationship issues just as had been the case in the Lease negotiations.

25.     When defendant took ownership of the building, plaintiff had no contact whatsoever from any senior or even not-so-senior people at Rockpoint, was generally rebuffed when plaintiff sought to reach out for such contact as a matter of establishing working relationships, was relegated to discussions with junior personnel at Rockhill in the occasional instances where any issue required discussion or interaction and, upon investigation, found that all personnel at Rockpoint, even though identified by name and title on a website, had no

published email addresses or direct phone numbers stated on that website or available to plaintiff by any other generally available means.

B.  *Restrictions Arising in March 2020*

26.     The backdrop of this litigation is the novel coronavirus that began to affect the United States and New York City during the winter of 2019-20.

27.     To address the coronavirus, government in general and the State of New York in particular imposed numerous restrictions on the use of commercial office space such as space leased by defendant to any tenant at 1700 Broadway, including space leased to plaintiff, rendering it impossible and unlawful for the Landlord to permit, much less encourage, use of the leased space in the manner contemplated under the Lease and similarly making it impossible and unlawful for plaintiff to use that space in that manner.

28.     One of the first significant restrictions — mandatory reduction in in-person workforce permitted at any commercial office space location — was put into effect by an Executive Order of the Governor of New York State in Executive Order 202.6, issued on March 18, 2020, and effective on March 20, 2020 ("EO 202.6").   In some of its relevant parts, especially as addressed to non-essential businesses, EO 202.6 provided:

> "Effective on March 20 at 8 p.m.:  All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize.  *Each employer shall reduce the in-person workforce at any work locations by 50% no later than March 20 at 8 p.m.*  Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions.  This includes essential health care operations including research and laboratory services; essential infrastructure including utilities, telecommunication, airports and transportation infrastructure; essential manufacturing, including food processing and pharmaceuticals; essential retail including grocery stores and pharmacies; essential services including trash collection, mail, and shipping services; news media; banks and related financial institutions; providers of basic necessities to economically disadvantaged populations; construction; vendors of essential services necessary to maintain the safety, sanitation and essential operations of residences or other

essential businesses; vendors that provide essential services or products, including logistics and technology support, child care and services needed to ensure the continuing operation of government agencies and provide for the health, safety and welfare of the public...." (Emphasis added.)

29.     As the word "essential" was defined in related pronouncements, neither the business of the Landlord at 1700 Broadway, including operating a commercial office building and holding it open to non-essential businesses for use of the space there, nor the business of any tenant at 1700 Broadway (including plaintiff), is deemed "essential" for purposes of these and related directives. ("Essential" businesses have been defined at https://esd.ny.gov/guidance-executive-order-2026.) The definition of "essential business" initially promulgated on March 20, 2020 defined "essential businesses" as including only "Essential Services Necessary to Maintain the Safety, Sanitation and Essential Operations of Residences or Other Essential Businesses, Including: ... security [and] building cleaners or janitors," but did not even include such functions or other building management conduct provided to *non*-essential businesses (certain such limited functions were apparently added as permissible as of further guidance on April 9, 2020). *See* https://www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order.

30.     A few days later, the Governor of New York State issued Executive Order 202.8 on March 20, 2020, and effective on March 22, 2020 ("EO 202.8"), among other things, expanding the prohibition on "in-person workforce" use of space such as that leased by plaintiff to a complete prohibition — 100% — and effectively shutting down all non-essential workplaces, including commercial office workplaces. In one of its relevant parts, EO 202.8, states:

"The provisions of Executive Order 202.6 are hereby modified to read as follows: Effective on March 22 at 8 p.m.:  All businesses and not-for-profit entities in the state

shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. *Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m.* Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function. *Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law.*" (Emphases added.)

31.     Contemporaneously, the Governor of New York issued a further

Executive Order known as the "New York State on PAUSE" Executive Order (the "PAUSE

Order"), directing, among other things:

"On Sunday, March 22, all non-essential businesses statewide closed when Governor Cuomo announced the 'New York State on PAUSE' Executive Order, a 10-point policy to assure uniform safety for everyone.

"The 10-point NYS on PAUSE plan is as follows:

"1. Effective at 8PM on Sunday, March 22, all non-essential businesses statewide will be closed;

"2. Non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations or other social events) are canceled or postponed at this time;

"3. Any concentration of individuals outside their home must be limited to workers providing essential services and social distancing should be practiced...."

The PAUSE Order may be found at https://coronavirus.health.ny.gov/new-york-state-pause.

32.     By direction of these executive orders, among other effects, it became

unlawful for the Landlord generally to operate the building at 1700 Broadway in the ordinary and

contemplated way, to operate the space leased to plaintiff in the ordinary and contemplated way or to

permit plaintiff to occupy the space in the ordinary and contemplated way, including as contemplated

by the Lease, or to receive the benefits of the space from the Landlord, and similarly became

unlawful for plaintiff itself to occupy the space in the manner contemplated by the Lease.

33.     By direction of these executive orders, the defendant cannot permit, conduct or perform non-essential work at 1700 Broadway — not for (or by) itself, not for (or by) its non-essential tenants (all of them) and not for (or by) plaintiff, but rather, must limit any operations to only "operate at the level necessary to provide such service or function" that is in fact "essential" (EO 202.8), and consistent with the PAUSE Order.

C.  *Plaintiff's Efforts to Communicate with Defendant in the Face of the March 2020 Events*

34.     Soon after these executive orders began to issue and be implemented, SZS reached out to defendant in writing in an attempt to address the restrictions identified above and the fact that it would be impermissible and unlawful for the Landlord, in these circumstances, to demand or collect rent under the Lease for a space the Landlord could not lawfully provide and that plaintiff could not lawfully use or have the benefit of, both under numerous common law and equitable doctrines and under the provisions of the Lease itself.

35.     As part of that effort, plaintiff first wrote to the building management personnel at Rockhill on March 19 and 22, 2020, informally, requesting that a dialogue be commenced with Rockpoint personnel with authority to address these issues.

36.     No such dialogue was commenced from defendant's side.

37.     Plaintiff then gave defendant a notice (without prejudice to other rights and remedies) in accordance with certain provisions of the Lease, dated and sent by overnight delivery on March 25, 2020, consistent with and in accordance with provisions of the Lease, including as set forth in Lease §14.3 (and with an eye to purported Lease deadlines for notices of the sort).

38.     In the same communication, plaintiff noted its earlier communications on March 19 and 22 and again pointed out the need to address the situation overall in a dialogue that would address the numerous issues presented.

39.     On April 3, 2020, having had no substantive reply, plaintiff again wrote to defendant, including by sending copies to email addresses for a number of senior personnel at Rockpoint whose email addresses were not published on Rockpoint's website but which were inferred, apparently correctly, from an email style used by Rockpoint which plaintiff was able to identify on the Internet.

D.  *Defendant's Responses — and Its Non-Responses*

40.     Defendant ignored the March 25 notice and all of this other correspondence for weeks but then wrote to plaintiff with a letter dated April 9, 2020, in which, in substance, it made three principal contentions:   (i) it was entitled to collect every penny of rent notwithstanding the circumstances, (ii) it was giving notice that it would imminently assert a default (with drastic consequences) if all claimed amounts were not paid and (iii) plaintiff should try to obtain insurance reimbursement and consider borrowing money or seek other government assistance for the purpose, in effect, of paying defendant in full what it claimed (so that it would suffer no loss at all even as enormous losses were then being suffered by many of its tenants and most participants in the local, national and world economies).

41.     Plaintiff did pay and has continued to pay with reservation and under protest.  Plaintiff has, at all times, continued, under protest (expressly reserving its right to bring this action), to pay rent and comply with all other obligations under the Lease.

42.     Defendant made no reference to the effective shutdown of its building and business and the other events and effects that were all ongoing and no reference to the impediments now imposed upon it.

43.     Defendant then introduced a long and persisting fiction of normalcy, expressing and implying that the building was, in effect, open for business in its usual ways and, as alleged below, added false window dressing to the assertion in innumerable ways in the months that followed.

E.   *Defendant's Disability to Make the Space Available to Plaintiff*

44.     In fact, however, commencing with the restrictions effective on March 22, 2020, defendant did not have the ability to perform under the Lease or to make the space at 1700 Broadway available to plaintiff in anything in the nature or the manner it was obligated to provide it to plaintiff or so that plaintiff could have the benefits of the Lease; indeed, had it done so, defendant would have been acting unlawfully, as alleged above, and if plaintiff had tried to use the space in that way, the Landlord would surely have not permitted it or been able to permit it as a matter of law, both because of its legal duties not to permit it and as a practical matter out of its own concerns and self-interest (just as plaintiff, separately and independently, became precluded by law from using or even attempting to use the space in the manner the parties intended in the Lease).

45.     All 1700 Broadway tenants are not "essential" (as the executive orders had defined "essential"), and almost all of defendant's operations, through Rockhill (or otherwise), at 1700 Broadway are not "essential," and under the mandate in EO 202.8, even to the extent defendant would be providing any essential services or functions (such as a "safety" function), while

it could perform a few very limited acts, it became required to only "operate at the level necessary to provide such service or function."

46.     By mandate of the executive orders, defendant could not conduct or perform non-essential work at 1700 Broadway — not for itself, not for non-essential tenants (all of them) and not for plaintiff, but rather, had to limit *any* operations to only "operate at the level necessary to provide such service or function" that is in fact "essential."   (EO 202.8)

47.     Thus, it became unlawful for defendant to permit plaintiff or those similarly situated to have the benefits of space, and it became unlawful for defendant and for those non-essential tenants, such as and including plaintiff, to use the space they had leased in anything like the manner provided for in the Lease (or similar leases).

48.     Any other view of, or conduct in, the circumstances as of late March would have been and would be silly and nonsensical and, in light of the public health crisis, would have been brazen disregard for the welfare of the public at large and gravely immoral in addition to being unlawful.

49.     To be clear, defendant indeed controlled and controls such situations, and this one in particular, in that it monitors and controls building access through a security system, monitors turnstiles used before entrants reach elevators and controls the elevators themselves — in other words, controls access and use (in these and other ways).

50.     In one of the few "essential" acts defendant could perform (related to safety), its lobby "security" team monitors and manages building access, including through a keycard electronic security system for all tenant personnel and a security check-in system requiring tenant authorization in the system identifying any guest visitors.

51.     Through these systems, in addition to personal observation and monitoring, all entries to the building are logged electronically, in real time, recording the date and time of each entrant by name.

52.     By way of illustration, typical use of space leased by plaintiff can be regularly daily occupancy by 40 to as many as perhaps 120 persons (including guests in the event of large or numerous meetings), all of whose entry would be known to defendant through its security systems.

53.     If such occupancy, or any material occupancy, had been attempted by plaintiff as of March 22, it had become unlawful, and it had become unlawful for defendant to have permitted it, or such entry, under the prevailing executive orders.

54.     Such occupancy by plaintiff would have been known to the Landlord; and it would not have been permitted by the Landlord if such occupancy has been attempted.[2]

55.     If plaintiff or any non-essential tenant had used the leased space at 1700 Broadway as was intended, the Landlord would have known; and the Landlord would not have permitted it.

56.     The space could not be accessed, and the Landlord could and would not permit access, by elevators or otherwise, by the normal array of people previously using the space on a daily basis.

57.     Indeed, in addition to the restrictions on normal daily use and occupancy, numerous otherwise routine functions had become similarly unlawful and would not have been permitted.

---

[2] To be sure, individuals associated with plaintiff and other tenants could and did permissibly enter the building on occasion — for example, to retrieve mail once it became allowed to be delivered in sporadic appearances or to obtain a necessary client or personal item.

58.     For example, an individual attorney arriving at or leaving the firm, or a licensee, could not have moved in or have moved out.

59.     Indeed, a tenant, even if wishing to move out as a necessary component of exercising the common lease clause (such as is present in plaintiff's Lease) known as a "Good Guy Clause" to end a lease as a practical matter under specified conditions, and cut off potential guarantor liability, could similarly not have taken the necessary steps to exercise that important right.

60.     In fact, a new employee, licensee or other person entitled to access to the premises could not have obtained a building security card (because Rockhill had removed all of its own building office and management employees from the premises), with the result that the people and machinery used to issue such security cards were closed and/or not on site and unavailable.

61.     At bottom, plaintiff could not use the space in almost any way and certainly not in any of the usual, ordinary and contemplated ways, and defendant could and would not enable, allow or permit such uses.

F.  *Defendant's Ruse that Material Business Operations Were Normal*

62.     As noted, defendant itself, through Rockhill, removed most of its own staff — in particular, its office and building management staff — from the premises.

63.     They were difficult to reach and unhelpful as to emergencies such as the non-delivery of mail to the premises, which at times included material important to clients.

64.     The Rockhill personnel appeared, nonetheless, to operate under a clear mandate to give the appearance of normalcy.

65.     By way of example, there was insistence that mail delivery was open at the building and happening in fact, even when USPS personnel indicated the opposite (and that the usual entrance for such delivery had been shut and was unattended).

66.     Defendant even went so far as to press for answers from plaintiff to inquiries about having individual offices cleaned — generally, that means the emptying of trash baskets and no more than that on a daily basis — despite it being manifestly clear that no one could be in the building to make or leave such trash, all part of a ruse consistent with extensive behavior engaged in and communication written to create the illusion of normal and ongoing use of the premises.

67.     Ironically, in one example, non-premises building office personnel sent an email offering that in honor of Earth Day on April 22, 2020, a coronavirus-related hand sanitizer giveaway would take place in the lobby, and that commercial office space tenants should alert their (non-present) teams to the offer, though noting that the hand sanitizers were in limited supply and available on only a first-come, first-served basis:

> "In celebration of Earth Day, we are distributing hand sanitizers at the lobby desk. Please stop by, supplies are limited and will be distributed on a first come first serve [sic] basis.  Please share this information with your teams as well."

68.     In some of the similar periodic email communications, the building management personnel sending them nonetheless acknowledged at times the reality that no tenants or building office personnel were actually in the building and that none could be.

69.     By way of example, in a notice transmitted to tenants by Rockhill in an e-mail of June 3, 2020, the Landlord acknowledged that it was merely "prepar[ing] for the return of non-essential workers to 1700 Broadway" and that, during the pendency of the coronavirus

crisis, "HVAC and plumbing systems have remained operational [merely] to accommodate essential tenant employees," of which, in any event, there were none, as alleged above.

70.     While limited, permissible "essential" functions with skeletal staff continued (such as a limited lobby security team of the sort described above, though in reduced numbers and, at least at times, with reduced hours and, upon information and belief, the basic and limited cleaning of the unused restrooms and essential air supply with limited air conditioning delivery), despite the ruses of normalcy described above, normal activity had ceased as of late March 2020.

71.     Even routine matters for defendant's own benefit, such as billing through to tenants of tenant electric charges and other non-base rent charges, was interrupted and became sporadic (for reasons not explained by defendant).

72.     All entrances/exits to the building except for the main door to the building were closed and/or unattended at all or at least many times.

73.     The US Postal Service, as alleged above, advised it could not at some times deliver mail to the building for that reason.

74.     The parking garage located in the building became largely unreachable by telephone at all, and when someone would answer the phone, the caller was told that the usual personnel were gone and that a New Jersey phone number should be called instead — a number that turned out to be the telephone number of an individual patron of the facility who himself had been trying to reach the garage about his own car.

75.     The Landlord is now seeking to collect rent from and presumably ultimately evict the operator of the garage facility at 1700 Broadway in a lawsuit that it has commenced in New York State Supreme Court.

G.   *Further Legal and Practical Impediments to the Landlord Permitting Plaintiff's Use*

76.   The defendant also had its own additional legal impediments to allowing plaintiff to use the premises, separate and apart from the executive orders, as well as its own self-interest, requiring that defendant not permit plaintiff to use the premises as allowed by the Lease.

77.   For example, the Landlord has an obligation to plaintiff and other tenants, as well as a self-interest, in having certain insurance in place with regard to the premises and the building.   (In the Lease, some aspects of this obligation are addressed in Article 6.)

78.   Permitting plaintiff to use the space, including in violation of the executive orders, would have imperiled and very possibly invalidated such insurance because of the unlawful nature of such a practice and activity and, upon information and belief, made it impossible for the Landlord to comply with its lease obligations to numerous tenants, presently and also to obtain such insurance in the future, and thereby further placed Landlord in default of all of its lease obligations at 1700 Broadway.

79.   The Landlord also has a Certificate of Occupancy (for example, *see* Lease Article 15), for the building — a legal requirement for operation of the building as a commercial office space and otherwise.   Upon information and belief, permitting the precluded use of the space by plaintiff or others would violate the Certificate of Occupancy, either directly or as a matter of and by operation of law, and would invalidate the Certificate of Occupancy, rendering it impossible for the Landlord permissibly to make the space available to any tenant under a lease similar to plaintiff's Lease and further place Landlord in default of all of its lease obligations at 1700 Broadway.

80.   Relatedly, Lease Article 35's indemnity provisions bar plaintiff from certain prohibited acts, such as doing or permitting any act or thing to be done "which may

21

subject Landlord to any liability or responsibility for injury, damages … or to any liability by reason of any violation of law."

81.    All of these facts and terms make clear that the parties did not intend that plaintiff would, in the face of such circumstances, nonetheless be deemed to be receiving what the Landlord promised or would be obligated to pay for it as if nothing had changed.

82.    Further, along similar lines, based upon communications from the Landlord during the course of the relationship, the Landlord itself has numerous obligations to and covenants in favor of its lenders and investors and parties in similar situations with respect to the business of the Landlord's own ownership.   Although those covenants have not been shared with plaintiff, it is common knowledge within the legal real estate and real estate business communities that various acts of misconduct, unlawful conduct and similar breaches of duty described above would violate such obligations and covenants to lenders, investors, *etc.*, at substantial cost and peril to the Landlord and its ownership and place the Landlord and its ownership in default under its agreements with such parties; and, upon information and belief, such would be the case and the result here from allowing tenants such as plaintiff to use their space despite the restrictions on doing so.

83.    Similarly and relatedly, upon information and belief, such obligations and covenants would be violated in other ways if the Landlord were to allow plaintiff's use of the space as contemplated despite the mandates of the executive orders, simply by imperiling, if not breaching or vitiating, mandated insurance and other requirements as set forth in those obligations and covenants.

84.    Further still, any such conduct arising out of the Landlord allowing plaintiff (or a similarly situated tenant) to use its space in contravention of the executive orders

would have consequences for the Landlord, negatively affecting its permissible operation

(through Rockhill) such that the Landlord would suffer further legal disability from operation of

the space for the benefit of other tenants and thereby place the Landlord in breach of and default

under its other leases at 1700 Broadway.

H.   *The Ongoing Restrictions*

85.     Even after the Governor of New York partially lifted some of the

restrictions of the PAUSE Order, in what has been known as Phase 2, effective on June 22,

2020,[3] plaintiff and other commercial office tenants have been limited to use of their offices only

to the extent of 50% of permitted occupancy, with numerous additional restrictions, including the

maintenance of a six-foot distance between all individuals and many other restrictions detailed in

elaborative documents, such as the one entitled "Interim Guidance for Office-Based Work

During the Covid-19 Public Health Emergency" and available at

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/offices-interim-

guidance.pdf.

86.     Consistent with the restrictions imposed in March upon landlords such as

defendant from permitting use by plaintiff and others in like situations from using their space,

New York State's "Interim Guidance for Commercial Building Management During the Covid-

19 Public Health Emergency," available at

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/commercial-building-

management-master-guidance.pdf, set forth extensive mandatory guidelines applicable in Phase

---

[3]  The announcement that New York City would be entering Phase 2 on June 22, 2020 was made by the
Governor on June 19, 2020 and is available here:   https://www.governor.ny.gov/news/governor-cuomo-
announces-new-york-city-cleared-global-public-health-experts-begin-phase-two.

2 to the conduct of landlords for the management of their buildings, such as that "Responsible Parties [defined to include building owners and managers], in coordination with ant tenants, must ensure that for any work occurring indoors, the total occupancy is limited to 50% of the maximum occupancy for a particular area as set forth by the certificate of occupancy…," along with numerous other duties for landlords to impose restrictions and burdens on tenant use.

87.     Through the time of filing this Complaint, the building itself remains essentially a ghost town, with reports of the entire building's daily occupancy by tenant personnel (and their guests/affiliates) generally being in the neighborhood of 60 entrants per day (up from approximately 35 in late July), as compared with reports of occupancy by approximately 1,500 to 2,000 tenants and guests on an ordinary day for the building as a whole before March 2020.

88.     The building exterior at 1700 Broadway, its ground floor retail spaces and the surrounding area remain a virtual ghost town.   Three of its five ground floor retail spaces are now vacant and/or closed, most street-level restaurants and other businesses within blocks of 1700 Broadway remain closed (many vacated) with many displaying signs stating that they are permanently closed, the streets in the area generally have minimal foot and vehicular traffic on weekdays as compared with pre-March 2020 traffic and a substantial number of the few people to be found in the area appear not to be nearby office occupants or even local residential residents (including some who are sleeping at various times throughout the day on the outdoor portion of the building property).

89.     In all of these and many other ways, the building at 1700 Broadway does not operate in the manner provided for and contemplated under the Lease as what is sometimes

referred to in the New York City real estate industry as a "First Class" or "Class A" Manhattan commercial office building.

90.     Nonetheless, both during the PAUSE Order and since, it is the defendant's position that the horrific consequences for businesses occupying its space at 1700 Broadway, even to the extent of paying rent for office space that the Landlord could not allow a party such as plaintiff to receive the benefits of, and which plaintiff could not have the benefit of, are, in simple terms, the problem, exclusively, of tenants such as plaintiff.

91.     According to the position of defendant Landlord, plaintiff and those similarly situated must pay the full Lease price of what the Landlord defendant could not make available and what a tenant such as plaintiff is not permitted to use, for an indeterminate and uncapped period of time, subject only to the duration of a lease's term.

92.     Nothing in the Lease supports defendant's conclusion, and indeed legal principles under common law and equity, as well as the Lease itself, are to the contrary (as alleged further below).

93.     Moreover, nothing in the discussions and negotiations leading up to the making of the Lease supports defendant's contentions and conclusion.

94.     Neither plaintiff nor the Landlord negotiated about or contemplated or even conceived of the situation such as the current situation, much less a result in such a situation in which a tenant (indeed, all similarly situated tenants) — even though unable to use their space by law and as a practical matter unable to receive the benefits of their space from the Landlord by law as a practical matter — would have an ongoing and unabated obligation to pay rent for the unavailable space for the full remaining term of the parties' lease.

95.     Certainly, neither plaintiff nor the Landlord expected or intended such a result.

96.     And the Landlord could not conceivably believe, despite its stated ruses and ostensible quasi-social events to hand out hand sanitizers, that it could permit any tenant's ordinary use of its space at 1700 Broadway (all such tenants being not "essential" as the executive orders have defined "essential"), legally or as a practical matter, or that those tenants, such as and including plaintiff, could lawfully or as a practical matter, or would unlawfully, be able to use the space they had leased.

97.     Yet the defendant persists in a fiction that nothing out of the ordinary has occurred insofar as affects it or that would affect the rights and duties of others or affect its right to full payment of every penny of rent from all of its dispossessed tenants, even though those tenants have not been able to use or occupy their space as contemplated, and even though many would simply fail as going concerns if they were obligated to make such payments in the circumstances.

98.     Put differently, the defendant persists in the position that, even though it at least tacitly concedes plaintiff and other tenants could not use their space under and since the executive orders in issue, the Landlord will suffer not a penny of the consequences of the current pandemic, and all corresponding costs and losses will be borne by its tenants despite the fact that they may not, and the Landlord may not let them, use their space as intended, and many will fail as going concerns if such payments are required.

99.     Defendant made its intent clear by, within a matter of hours after a breakdown in any discussions when plaintiff made known its intention to pursue its legal rights in litigation such as this, falsely asserting a Lease default with regard to plaintiff's security under

the Lease properly being in place — a Lease default claim that, after much effort by plaintiff which should not have been necessary, the Landlord ultimately conceded was completely lacking in any basis in fact (all of which remains unexplained to this date, despite plaintiff's requests for an explanation).

100.   The message was clear that the Landlord would press its positions to extract every penny of rent in the circumstances, despite the numerous reasons the circumstances vitiate its right to collect rent.

101.   In fact, the defendant Landlord is not above the fray in that way such that it loses nothing and others lose everything — not at law, not in equity and not under its Lease.

102.   This action — by which plaintiff SZS is seeking declaratory relief establishing its right to terminate the Lease or, at the least, not pay rent while these conditions persist, money damages in the form of return of rent paid and the substantive equivalent of a *Yellowstone* injunction to permit plaintiff to withhold rent without incurring a default (or other adverse consequence as alleged above) during the pendency of this action — follows.[4]

**FIRST CAUSE OF ACTION**
(Declaration of Lease Termination — or, at a Minimum, Right
to Withhold Rent — Due to Frustration of Purpose)

103.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

104.   The principal object of the Lease was SZS's use of the leased space to conduct its business.

---

[4] Additional facts pertinent to particular causes of action appear within those causes of action.

105.    The principal object of the Lease, as set forth at §12.8 thereof, is SZS's right, as part of its business, to license to others up to 60% of its space (with all such licensees being able to use the space in the same manner as does plaintiff for normal business operations) and all of whom have been subject to the same impediments from the Landlord and otherwise as alleged herein.

106.    The principal object of the Lease was frustrated, within the meaning of the doctrine of frustration of purpose, when, by reason of the executive orders and shutdown and the impediments to the use of plaintiff's space, SZS (including its licensees) was, commencing in March 2020, barred from its normal and ordinary use of the space as contemplated under the Lease.

107.    Furthermore, to the extent continued restrictions — such as, *inter alia*, any maximum occupancy limits and minimum distance requirements — on the use and/or occupancy of the space continue in force, such restrictions continue to frustrate the principal object of the Lease.

108.    Without being able to avail itself of the principal benefits of the Lease, the transaction, *viz.*, plaintiff's entering into the Lease, would have made little sense, and plaintiff would never have entered into the Lease.

109.    The once-in-a-century global coronavirus pandemic and resulting executive orders and wholly unprecedented shutdown and related impediments for both the Landlord and everyone else affected were not contingencies or risks that SZS could have foreseen or assumed under the Lease.

110.    The parties to the Lease did not foresee what has occurred.

111.    Even if the possibility of a disease pandemic were to be considered foreseeable, the scope of this pandemic and the resulting responses, shutdowns and complete loss

of use of SZS's office space were in no way foreseeable, foreseen or risks assumed under the Lease.

112.     In these circumstances, consideration for the Lease has failed.

113.     In these circumstances, SZS's performance, *i.e.*, payment obligations, is excused under the common law doctrine of frustration of purpose.

114.     An actual justiciable controversy now exists between SZS and the Landlord concerning the rights and obligations of the parties under the Lease.   Specifically, the parties disagree as to whether SZS is entitled to terminate the Lease or withhold rent and receive repayment of rent paid for any periods during which its use of its leased space on the terms agreed upon and as contemplated under the Lease is fundamentally frustrated.

115.     SZS has a legally protectable interest in this controversy.   Specifically, SZS has a pecuniary interest in a declaration that it has the right to terminate the Lease and no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease for any period after the executive orders went into effect in March 2020 (or such other period as the Court may determine).

116.     The controversy is ripe for adjudication, and a judicial declaration is necessary to end the present controversy.

117.     Therefore, SZS seeks a declaration establishing that the Lease was terminated by reason of the doctrine of frustration of purpose as of the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine) (with no further liability for plaintiff and with no liability for any guarantor of the Lease).

118.     Alternatively, and at a minimum, SZS seeks a declaration that, by reason of the doctrine of frustration of purpose, during the pendency of the executive orders and the

impediments to its use of the space, and continuing until such time as it regains full use of its leased space as contemplated under the Lease, SZS was and is entitled to withhold further payment of rent and other amounts ordinarily required to be paid to the Landlord pursuant to the Lease.

## SECOND CAUSE OF ACTION
### (Return of Rent Paid Due to Frustration of Purpose)

119.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

120.   SZS has, at all times, continued, under protest (expressly reserving its right to bring this action), to pay rent and comply with all other obligations under the Lease.

121.   For all the reasons stated in the foregoing cause of action, SZS is entitled to repayment of rent and other amounts paid pursuant to the Lease for the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine).

## THIRD CAUSE OF ACTION
### (Declaration of Lease Termination — or, at a Minimum, Right to Withhold Rent — Due to Impossibility)

122.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

123.   The executive orders and other governmental action leading to the shutdown due to the coronavirus pandemic have created a substantially unjust situation totally outside the parties' contemplation at the time the Lease was negotiated and agreed upon.

124.   No experienced draftsman could have anticipated or foreseen the once-in-a-generation coronavirus pandemic and the ensuing statewide shutdown.

125.    The parties to the Lease did not foresee what has occurred.

126.    Where, as here, governmental public health regulations have prevented the Landlord's performance, *viz.*, have made it impossible to offer the leased space to SZS on the terms agreed (notwithstanding any violation of those regulations by the Landlord), the doctrine of impossibility excuses the Landlord's duty to perform and, as a necessary consequence, excuses SZS's duty of payment.

127.    Where, as here, governmental public health regulations have made SZS's use of its leased space on the terms set forth in the Lease impossible, the doctrine of impossibility also excuses SZS's duty of payment.

128.    An actual justiciable controversy now exists between SZS and the Landlord concerning the rights and obligations of the parties under the Lease.   Specifically, the parties disagree as to whether SZS is entitled to terminate the Lease or withhold rent and receive repayment of rent paid for any periods during which its use of its leased space as contemplated under the Lease on the terms agreed upon is prevented.

129.    SZS has a legally protectable interest in this controversy.   Specifically, SZS has a pecuniary interest in a declaration that it has the right to terminate the Lease and no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease after the executive orders went into effect in March 2020 (or such other period as the Court may determine).

130.    The controversy is ripe for adjudication, and a judicial declaration is necessary to end the present controversy.

131.    Therefore, SZS seeks a declaration establishing that the Lease was terminated by reason of the doctrine of impossibility as of the time when the executive orders

went into effect in March 2020 (or such other period as the Court may determine) (with no further liability for plaintiff and with no liability for any guarantor of the Lease).

132.    Alternatively, and at a minimum, SZS seeks a declaration that, by reason of the doctrine of impossibility, during the pendency of the executive orders and the impediments to its use of the space and continuing until such time as it regains full use of its leased space as contemplated under the Lease, SZS was and is entitled to withhold further payment of rent and other amounts ordinarily required to be paid to the Landlord pursuant to the Lease.

FOURTH CAUSE OF ACTION
(Return of Rent Paid Due to Impossibility)

133.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

134.    SZS has, at all times, continued, under protest (expressly reserving its right to bring this action), to pay rent and comply with all other obligations under the Lease.

135.    For all the reasons stated in the foregoing cause of action, SZS is entitled to repayment of rent and other amounts paid pursuant to the Lease for the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine).

FIFTH CAUSE OF ACTION
(Declaration of Lease Termination — or, at a Minimum,
Right to Withhold Rent — Due to Commercial Impracticability)

136.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

137.    The executive orders and other governmental action leading to the shutdown due to the coronavirus pandemic have created a substantially unjust situation totally outside the parties' contemplation at the time the Lease was negotiated and agreed upon.

138.    No experienced draftsman could have anticipated or foreseen the once-in-a-generation coronavirus pandemic and the ensuing statewide shutdown.

139.    The parties to the Lease did not foresee what has occurred.

140.    Where, as here, governmental public health regulations have made the Landlord's performance commercially impracticable, *viz.*, have made it commercially impracticable to offer the leased space to SZS on the terms agreed (notwithstanding any violation of those regulations by the Landlord), the doctrine of commercial impracticability excuses the Landlord's duty to perform and, as a necessary consequence, excuses SZS's duty of payment.

141.    Where, as here, governmental public health regulations have made SZS's use of its leased space on the terms set forth in the Lease commercially impracticable, the doctrine of commercial impracticability excuses SZS's duty of payment.

142.    An actual justiciable controversy now exists between SZS and the Landlord concerning the rights and obligations of the parties under the Lease.   Specifically, the parties disagree as to whether SZS is entitled to terminate the Lease or withhold rent and receive repayment of rent paid for any periods during which its use of its leased space as contemplated under the Lease has been rendered commercially impracticable.

143.    SZS has a legally protectable interest in this controversy.   Specifically, SZS has a pecuniary interest in a declaration that it has the right to terminate the Lease and no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease after

the executive orders went into effect in March 2020 (or such other period as the Court may

determine).

144.    The controversy is ripe for adjudication, and a judicial declaration is

necessary to end the present controversy.

145.    Therefore, SZS seeks a declaration establishing that the Lease was

terminated by reason of the doctrine of commercial impracticability as of the time when the

executive orders went into effect in March 2020 (or such other period as the Court may

determine) (with no further liability for plaintiff and with no liability for any guarantor of the

Lease).

146.    Alternatively, and at a minimum, SZS seeks a declaration that, by reason

of the doctrine of commercial impracticability, during the pendency of the executive orders and

the impediments to its use of the space, continuing until such time as it regains full use of its

leased space as contemplated under the Lease, SZS was and is entitled to withhold further

payment of rent and other amounts ordinarily required to be paid to the Landlord pursuant to the

Lease.

SIXTH CAUSE OF ACTION
(Return of Rent Paid Due to Commercial Impracticability)

147.    Plaintiff repeats and realleges each and every allegation set forth above as

if fully set forth here.

148.    SZS has, at all times, continued, under protest (expressly reserving its

right to bring this action), to pay rent and comply with all other obligations under the Lease.

149.    For all the reasons stated in the foregoing cause of action, SZS is entitled

to repayment of rent and other amounts paid pursuant to the Lease for the time when the

executive orders went into effect in March 2020 (or such other period as the Court may

determine).

SEVENTH CAUSE OF ACTION<br>(Declaration of Right to Withhold Rent Under the Terms of the Lease)

150.    Plaintiff repeats and realleges each and every allegation set forth above as

if fully set forth here.

151.    The express terms of SZS's Lease entitles it to return of rent paid and to

withhold rent during the pendency of the executive orders and the impediments to its use of the

space alleged herein for as long as it is otherwise unable to use its leased space as contemplated

under the Lease.

152.    Lease §14.3, in relevant part, reads as follows:

"If due to any work or installation performed by Landlord hereunder or
failure by Landlord to provide services to the Premises in accordance with the
provisions of this Lease, (i) Tenant shall be unable for at least ten (10)
consecutive Business Days or fourteen (14) Business Days in any period of
twenty-five (25) consecutive Business Days (after Tenant shall have notified
Landlord of its inability) to operate its business in the Premises in
substantially the same manner as such business was operated prior to the
performance of such work or installation or such failure and (ii) such
interruption shall occur during business hours, the Fixed Rent and the
Escalation Rent shall be reduced on a per diem basis in the proportion in
which the area of the portion of the Premises which is unusable bears to the
total area of the Premises for each day subsequent to the aforesaid ten (10)
consecutive Business Day period or fourteen (14) Business Day period that
such portion of the Premises became unusable (and Tenant actually did not
use such portion for the conduct of business) until the earlier of (x) the first
Business Day after the date the work or installation are completed or the day
the services are provided, as the case may be, by Landlord and (y) the date
Tenant shall reoccupy the affected portion of the Premises for the conduct of
business."

153.    SZS expressly gave defendant notice under this section (explicitly referencing

§14.3) through its letter of March 25, 2020.

154.   Defendant ignored that notice until finally responding in a letter dated April 9, 2020, in which it denied that any interruption of services had occurred and threatened to hold SZS in default if rent was not paid, notwithstanding the notice and the circumstances.

155.   In fact, the circumstances described in §14.3 have indisputably occurred, and had occurred at the time of plaintiff's notice, due to the fact that, as alleged above, by direction of the executive orders, among other effects, it became unlawful for the Landlord generally to operate the building at 1700 Broadway in the ordinary and contemplated way, to operate the space leased to plaintiff in the ordinary and contemplated way or to permit plaintiff to occupy the space in the ordinary and contemplated way, including as contemplated by the Lease, or to receive the benefits of the space from the Landlord, and similarly became unlawful for plaintiff itself to occupy the space in the manner contemplated by the Lease.

156.   SZS cannot possibly receive any services allegedly rendered when it cannot occupy the leased premises at all.

157.   Pursuant to §14.3, SZS is entitled to withhold rent for all periods beginning 10 business days after serving its notice of March 25, 2020 and continuing until it can make full use of the leased space pursuant to §14.3.

158.   An actual controversy of a justiciable nature now exists between SZS and the Landlord concerning the rights and obligations of the parties under the Lease. Specifically, the parties disagree as to whether, under the terms of Lease §14.3, SZS is entitled to withhold rent and receive repayment of rent paid for the period at issue.

159.   SZS has a legally protectable interest in this controversy.   Specifically, SZS has a pecuniary interest in a declaration that it has no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease for the period at issue.

160.    The controversy is ripe for adjudication, and a judicial declaration is necessary to end the present controversy.

161.    Therefore, SZS seeks a declaration that the Landlord is in breach of Lease §14.3, and that SZS is entitled to withhold rent for all periods beginning 10 business days after serving its notice of March 25, 2020 and continuing until it can make full use of the leased space as contemplated under the Lease (including its §14.3).

## EIGHTH CAUSE OF ACTION
(Return of Rent Paid Under the Terms of the Lease)

162.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

163.    SZS has, at all times, continued, under protest (expressly reserving its right to bring this action), to pay rent and comply with all other obligations under the Lease.

164.    For all the reasons stated in the foregoing cause of action, SZS is entitled to repayment of rent paid pursuant to the Lease for all periods beginning 10 business days after serving its notice of March 25, 2020 and continuing until it can make full use of the leased space as contemplated under the Lease (including its §14.3).

## NINTH CAUSE OF ACTION
(Declaration of Lease Termination — or, at a Minimum, Right
to Withhold Rent — Due to Unconscionability Under RPL §235-c)

165.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

166.    To the extent the Lease could be otherwise construed to hold SZS liable for continued payment of rent in the current circumstances, Real Property Law ("RPL") §235-c

permits the Court to set aside the Lease to avoid an unconscionable result, and the Court should do so here.

167.    As alleged herein, SZS had a lack of meaningful choice in negotiating the Lease, such that it can satisfy the element of "procedural unconscionability."

168.    In these circumstances, it would be unconscionable to interpret the Lease, especially in the absence of any clear term and/or specific discussion and/or negotiation about a scenario such as the present scenario, such that SZS would be liable for rent for months on end or even longer during a time when it would be deprived of its consideration for entering into the Lease, *i.e.,* the right to use of its leased space as alleged herein.

169.    This situation is sufficient to show the elements of unequal bargaining power, high-pressure negotiating environment and imbalance in the understanding and experience in the subject matter of the parties that would amount to a lack of meaningful choice and, as such, qualify as procedural unconscionability.

170.    Enforcing the Lease against SZS to require continued payment of rent in these circumstances would also constitute substantive unconscionability, for the reasons alleged herein, and is an unreasonable bargain that no one would make.

171.    As such, it would be unconscionable under RPL §235-c to interpret the Lease to require SZS to continue payment of rent in these circumstances.

172.    An actual justiciable controversy now exists between SZS and the Landlord concerning the rights and obligations of the parties under the Lease.   Specifically, the parties disagree as to whether SZS is entitled to terminate the Lease because of unconscionability or withhold rent and receive repayment of rent paid for any periods during which an obligation for SZS to pay rent would be unconscionable.

173.   SZS has a legally protectable interest in this controversy.   Specifically, SZS has a pecuniary interest in a declaration that it has the right to terminate the Lease and no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease after the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine).

174.   The controversy is ripe for adjudication, and a judicial declaration is necessary to end the present controversy.

175.   Therefore, SZS seeks a declaration establishing that the Lease was terminated pursuant to the doctrine of unconscionability under RPL §235-c as of the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine) (with no further liability for plaintiff and with no liability for any guarantor of the Lease).

176.   Alternatively, at a minimum, SZS seeks a declaration that, pursuant to the doctrine of unconscionability under RPL §235-c, during the pendency of the executive orders and the impediments to its use of the space as contemplated under the Lease and continuing until such time as it regains full use of its leased space as contemplated under the Lease, SZS was and is entitled to withhold further payment of rent and other amounts ordinarily required to be paid to the Landlord pursuant to the Lease.

177.   At a minimum, SZS is entitled to a hearing under RPL §235-c(2) "to be afforded a reasonable opportunity to present evidence" as to the Lease's "setting, purpose and effect to aid the court in making the determination" of unconscionability.

## TENTH CAUSE OF ACTION
### (Return of Rent Paid Due to Unconscionability Under RPL §235-c)

178.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

179.     SZS has, at all times, continued, under protest (expressly reserving its right to bring this action), to pay rent and comply with all other obligations under the Lease.

180.     For all the reasons stated in the foregoing cause of action and because it would be unconscionable for the Landlord to retain rent SZS paid in these circumstances, SZS is entitled to repayment of rent and other amounts paid pursuant to the Lease for the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine).

181.     At a minimum, SZS is entitled to a hearing under RPL §235-c(2) "to be afforded a reasonable opportunity to present evidence" as to the Lease's "setting, purpose and effect to aid the court in making the determination" of unconscionability.

## ELEVENTH CAUSE OF ACTION
### (Declaration of Right to Withhold Rent — Due to Illegality)

182.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

183.     The Lease, at §2.1, permits the use of the leased premises "as general and executive offices … and for no other purpose."

184.     Pursuant to EO 202.8 and the other executive orders and official guidance elaborating upon those orders, SZS is not an "essential business" as defined in those orders, and it is illegal for the Landlord to hold the space open for the only purpose permitted to SZS under

the Lease; and it is also illegal for SZS to use its space for the only purpose permitted under the Lease.

185.   The executive orders were enacted for the protection of public health and welfare.

186.   Because the Landlord's allowance of SZS's use, and any use by SZS of the premises, as contemplated under the Lease during the pendency of the executive orders and the impediments to SZS's use of its space, would violate those orders and that law intended to protect against endangering the public health and welfare, to allow the Landlord to collect rent for ostensibly holding open the space to SZS to use during the pendency of the executive orders and the impediments to SZS's use of its space would permit the Landlord to profit from an ostensible violation of the public health and safety executive orders and law through ostensible acts that would endanger public health and welfare.

187.   For the foregoing reasons, during the pendency of the executive orders and the impediments to SZS's use of its space, the Lease is an illegal contract and is unenforceable against SZS.

188.   An actual justiciable controversy now exists between SZS and the Landlord concerning the rights and obligations of the parties under the Lease.   Specifically, the parties disagree as to whether SZS is entitled to terminate the Lease or withhold rent and receive repayment of rent paid for any periods during which its use of its leased space as contemplated under the Lease is barred or negated by the doctrine of illegality.

189.   SZS has a legally protectable interest in this controversy.   Specifically, SZS has a pecuniary interest in a declaration that it has no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease after the time when the executive

orders and the impediments to SZS's use of its space went into effect in March 2020 (or such

other period as the Court may determine, including a period of any subsequent executive order or

other law, legislation or similar action that would similarly prohibit or restrict SZS's use of the leased

premises).

190.    The controversy is ripe for adjudication, and a judicial declaration is

necessary to end the present controversy.

191.    Therefore, SZS seeks a declaration establishing that, pursuant to the

common law doctrine of illegality, it has no obligation to continue to pay the Landlord rent and

other amounts due pursuant to the Lease for any period as of the time when the executive orders

and the impediments to SZS's use of its space went into effect in March 2020 (or such other

period as the Court may determine, including a period of any subsequent executive order or other

law, legislation or similar action that would similarly prohibit or restrict SZS's use of the leased

premises).

TWELFTH CAUSE OF ACTION
(Return of Rent Paid Due to Illegality)

192.    Plaintiff repeats and realleges each and every allegation set forth above as

if fully set forth here.

193.    SZS has, at all times, continued, under protest (expressly reserving its

right to bring this action), to pay rent and comply with all other obligations under the Lease.

194.    For all the reasons stated in the foregoing cause of action and because it

would be illegal for the Landlord to retain rent SZS paid in these circumstances, SZS is entitled

to repayment of rent and other amounts paid pursuant to the Lease for the time when the

executive orders and other impediments to SZS's use of its space went into effect in March 2020

(or such other period as the Court may determine, including a period of any subsequent executive order or other law, legislation or similar action that would similarly prohibit or restrict SZS's use of the leased premises).

### THIRTEENTH CAUSE OF ACTION
(Declaration of Lease Termination — or, at a Minimum, Right
to Withhold Rent — Due to Material Breach)

195.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

196.    Due to the pendency of the executive orders and the impediments to SZS's use of its space, the Landlord's allowance of SZS's use, and any use by SZS of the premises, as contemplated under the Lease, would violate those orders.

197.    For that reason, the Landlord cannot allow and has not allowed SZS to use its space as contemplated under the Lease.

198.    By reason of the foregoing, consideration for the Lease has failed, and the Landlord is in material breach of its obligations under the Lease.

199.    An actual justiciable controversy now exists between SZS and the Landlord concerning the rights and obligations of the parties under the Lease.   Specifically, the parties disagree as to whether SZS is entitled to terminate the Lease by reason of the Landlord's material breach or entitled, for that same reason, to withhold rent and receive repayment of rent paid for any periods during which SZS's use of its leased space as contemplated under the Lease is barred or negated.

200.    SZS has a legally protectable interest in this controversy.   Specifically, SZS has a pecuniary interest in a declaration that it has no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease after the time when the executive

orders and the impediments to SZS's use of its space went into effect in March 2020 (or such other period as the Court may determine, including a period of any subsequent executive order or other law, legislation or similar action that would similarly prohibit or restrict SZS's use of the leased premises).

201.   The controversy is ripe for adjudication, and a judicial declaration is necessary to end the present controversy.

202.   Therefore, SZS seeks a declaration establishing that the Lease was terminated by reason of the Landlord's material breach of the Lease as of the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine) (with no further liability for plaintiff and with no liability for any guarantor of the Lease).

203.   Alternatively, and at a minimum, SZS seeks a declaration that, by reason of the Landlord's material breach of the Lease during the pendency of the executive orders and the impediments to its use of the space, continuing until such time as it regains full use of its leased space as contemplated under the Lease, SZS was and is entitled to withhold further payment of rent and other amounts ordinarily required to be paid to the Landlord pursuant to the Lease.

### FOURTEENTH CAUSE OF ACTION
(Return of Rent Paid Due to Material Breach)

204.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

205.   SZS has, at all times, continued, under protest (expressly reserving its right to bring this action), to pay rent and comply with all other obligations under the Lease.

206.    For all the reasons stated in the foregoing cause of action, SZS is entitled to repayment of rent and other amounts paid pursuant to the Lease for the time when the executive orders and other impediments to SZS's use of its space went into effect in March 2020 (or such other period as the Court may determine, including a period of any subsequent executive order or other law, legislation or similar action that would similarly prohibit or restrict SZS's use of the leased premises).

## FIFTEENTH CAUSE OF ACTION
(Yellowstone Injunction)

207.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

208.    SZS holds a commercial lease.

209.    SZS has received from the Landlord tangible threats of default/termination under the Lease, including should it cease to pay rent under the Lease, *viz.*, the Landlord's April 9, 2020, correspondence and ill-conceived tenant security correspondence alleged above.

210.    The Lease has not yet been terminated.

211.    SZS has been paying rent under protest to avoid the Landlord's threat, and SZS is prepared and maintains the ability to cure any alleged default by any means short of vacating the premises.

212.    For these reasons and in order to preserve the *status quo* pending resolution of this action, SZS should be granted a preliminary injunction in the nature of a *Yellowstone* injunction and should be granted such injunctive relief to prevent defendant from declaring a default and taking any action to terminate the Lease due to non-payment of rent during the pendency of this action.

213.    SZS has not previously requested such relief.

WHEREFORE, SZS demands judgment in its favor and against the Landlord as follows:

a.      on its First Cause of Action, a declaration establishing that the Lease was terminated by reason of the doctrine of frustration of purpose as of the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine) (with no further liability for plaintiff and with no liability for any guarantor of the Lease), or, at a minimum and in the alternative, a declaration that, by reason of the doctrine of frustration of purpose, during the pendency of the executive orders and the impediments to SZS's use of the space in issue and continuing until such time as it would regain full use of that space as contemplated under the Lease, SZS was and is entitled to withhold payment of rent and other amounts ordinarily required to be paid to the Landlord in accordance with the Lease;

b.      on its Second Cause of Action, damages in an amount to be proven at trial;

c.      on its Third Cause of Action, a declaration establishing that the Lease was terminated by reason of the doctrine of impossibility as of the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine) (with no further liability for plaintiff and with no liability for any guarantor of the Lease), or, at a minimum and in the alternative, a declaration that, by reason of the doctrine of impossibility, during the pendency of the executive orders and the impediments to SZS's use of the space in issue and continuing until such time as it would regain full use of that space as contemplated under the Lease, SZS was and is entitled to withhold payment of

rent and other amounts ordinarily required to be paid to the Landlord in accordance with
the Lease;

      d.      on its Fourth Cause of Action, damages in an amount to be proven at trial;

      e.      on its Fifth Cause of Action, a declaration establishing that the Lease was
terminated by reason of the doctrine of commercial impracticability as of the time when
the executive orders went into effect in March 2020 (or such other period as the Court
may determine) (with no further liability for plaintiff and with no liability for any
guarantor of the Lease), or, at a minimum and in the alternative, a declaration that, by
reason of the doctrine of commercial impracticability, during the pendency of the
executive orders and the impediments to SZS's use of the space in issue and continuing
until such time as it would regain full use of that space as contemplated under the Lease,
SZS was and is entitled to withhold payment of rent and other amounts ordinarily
required to be paid to the Landlord in accordance with the Lease;

      f.      on its Sixth Cause of Action, damages in an amount to be proven at trial;

      g.      on its Seventh Cause of Action, a declaration that the Landlord is in
breach of Lease §14.3, and that SZS is entitled to withhold rent for all periods beginning
10 business days after serving its notice of March 25, 2020 and continuing until it can
make full use of the leased space in accordance with Lease §14.3;

      h.      on its Eighth Cause of Action, damages in an amount to be proven at trial;

      i.      on its Ninth Cause of Action, SZS seeks a declaration establishing that the
Lease was terminated pursuant to the doctrine of unconscionability under RPL §235-c as
of the time when the executive orders went into effect in March 2020 (or such other
period as the Court may determine) (with no further liability for plaintiff and with no

liability for any guarantor of the Lease), or, at a minimum and in the alternative, a declaration that, pursuant to the doctrine of unconscionability under RPL §235-c, during the pendency of the executive orders and the impediments to SZS's use of the space in issue and continuing until such time as it would regain full use of that space as contemplated under the Lease, SZS was and is entitled to withhold payment of rent and other amounts ordinarily required to be paid to the Landlord in accordance with the Lease; and further, at a minimum, a hearing under RPL §235-c(2) for SZS "to be afforded a reasonable opportunity to present evidence" as to the Lease's "setting, purpose and effect to aid the court in making the determination" of unconscionability;

j.      on its Tenth Cause of Action, damages in an amount to be proven at trial and, at a minimum, a hearing under RPL §235-c(2) for SZS "to be afforded a reasonable opportunity to present evidence" as to the Lease's "setting, purpose and effect to aid the court in making the determination" of unconscionability;

k.      on its Eleventh Cause of Action, a declaration establishing that, pursuant to the common law doctrine of illegality, SZS has no obligation to continue to pay the Landlord rent and other amounts due pursuant to the Lease as of the time when the executive orders and the impediments to SZS's use of its space went into effect in March 2020 (or such other period as the Court may determine, including a period of any subsequent executive order or other law, legislation or similar action that would similarly prohibit or restrict SZS's use of the leased premises), or, at a minimum and in the alternative, a declaration that, by reason of the doctrine of illegality, during the pendency of the executive orders and the impediments to SZS's use of the space in issue and continuing until such time as it would regain full use of that space as contemplated under the Lease,

SZS was and is entitled to withhold payment of rent and other amounts ordinarily required to be paid to the Landlord in accordance with the Lease;;

l.      on its Twelfth Cause of Action, damages in an amount to be proven at trial;

m.      on its Thirteenth Cause of Action, a declaration establishing that the Lease was terminated by reason of the Landlord's material breach of the Lease as of the time when the executive orders went into effect in March 2020 (or such other period as the Court may determine) (with no further liability for plaintiff and with no liability for any guarantor of the Lease), or, at a minimum and in the alternative, a declaration that, by reason of the Landlord's material breach of the Lease, during the pendency of the executive orders and the impediments to SZS's use of the space in issue and continuing until such time as it would regain full use of that space as contemplated under the Lease, SZS was and is entitled to withhold payment of rent and other amounts ordinarily required to be paid to the Landlord in accordance with the Lease;

n.      on its Fourteenth Cause of Action, damages in an amount to be proven at trial;

o.      on its Fifteenth Cause of Action, a preliminary injunction in the nature of a *Yellowstone* injunction to preserve the *status quo* pending resolution of this action and to prevent the Landlord from declaring a default and taking any action to terminate the Lease due to non-payment of rent during the pendency of this action; and

p.      pre-judgment and post-judgment interest, attorneys' fees as allowed by law, costs and disbursements;

together with such other and further relief for plaintiff SZS and against the defendant Landlord

as the Court may deem just and proper.

Dated: New York, NY
       September 10, 2020

                                    SCAROLA ZUBATOV SCHAFFZIN PLLC


                                    By
                                       _____
                                       Richard J.J. Scarola
                                       *Attorneys for Plaintiff* Pro Se
                                       1700 Broadway
                                       41st Floor
                                       New York, NY    10019
                                       Tel.:   (212) 757-0007